# WILLIAM HOUSTON RYMER, etc., v. MABEL SMITH et al.—274 S. W. (2d) 643.

Eastern Section.   August 13, 1954.

Petition for Certiorari denied by Supreme Court, September 6, 1954.

Moon & Anderson, and Spears, Reynolds, Moore & Rebman, all of Chattanooga, for appellants.

H. L. Barger, of Chattanooga, for appellees.

H. F. Krickenberger, of Cincinnati, Ohio, and W. L. Schram, R. W. Leslie, both of Nashville, for Veterans' Administration.

HOWARD, J. The bill herein was filed for the purpose of setting aside a deed and a deed of trust executed

by William Houston Rymer, an ex-soldier of World War II, who, previous to either of the transactions, had been adjudged mentally incompetent in the County Court of Hamilton County under the provisions of the Uniform Veterans' Guardian Act, Chapter 90, Public Acts of 1943, Code Secs. 8541 et seq., of Williams' Tennessee Code. The record discloses the following undisputed facts:

In September 1947, after Rymer was discharged from the Army but before the proceedings in the County Court, he purchased three lots situated on Jenkins Road, in the Second Civil District of Hamilton County, agreeing to pay therefor $2,500. Rymer paid more than half the agreed purchase price before December 7, 1949, on which date he was adjudged mentally incompetent in the County Court of said County upon a petition previously filed by C. M. Hickerson, as next friend, a representative of the Nashville Office of the Veterans Administration, an agency of the United States Government.

The petition filed by Hickerson alleged in substance that Rymer, age 34, was a veteran and entitled to draw disability benefits from the U. S. Government because of his military service; that he had been examined by doctors of the Veterans Administration and found to be suffering from a mental disability, rendering him incompetent and in need of a guardian. The petition further recited that it was filed in accordance with the Uniform Veterans' Guardianship Act of Tennessee, and prayed that Mr. Walter O'Millinuk, of Chattanooga, Tennessee, be appointed as Rymer's Guardian. Thereafter, the following order was entered:

"In the Matter of the Estate of    ⎫
William Houston Rymer, N. C. Mentis ⎬
                                    ⎭

Order Appointing Walter O'Millinuk, Guardian

This cause came on to be heard before the Court this 7 day of December, 1949, upon the petition of C. M. Hickerson Next Friend praying to have a guardian appointed under the provisions of Public Chapter 90, Acts of the General Assembly of Tennessee of 1943, otherwise known as the Uniform Veterans Guardianship Act,

It appearing to the Court that the requirements of the aforesaid Act have been met by service of process and/or personal appearance of the said William Houston Rymer and that the said William Houston Rymer is Incompetent and that Walter O'Millinuk is a fit and proper person to be appointed guardian, it is accordingly,

Ordered, Adjudged and Decreed that said Walter O'Millinuk be and he is hereby appointed guardian of The Estate of William Houston Rymer, having qualified under good and solvent bond in the penal sum of $2000.00 Dollars, conditioned as provided by law and same having been duly approved by the Court, and the Clerk of this Court will issue the Letters of Guardianship."

Subsequently, the Veterans Administration paid Rymer's compensation to the Guardian, who used $1157.39 in paying off the balance owed by Rymer on the above described real estate. This payment, about which there was no dispute, was made several months before either of the instruments involved herein were executed by him.

On August 3, 1951, nearly two years after Rymer was adjudged mentally incompetent, he borrowed $800 from the Fidelity Trust Company, a Chattanooga concern, for which he executed two notes of $400 each. These notes were secured by a deed of trust upon his Jenkins Road property. The Milligan-Reynolds Title Agency, Inc.,

also a Chattanooga concern, was named Trustee in the trust deed. The record fails to disclose how Rymer spent the proceeds of this loan. Later, on March 6, 1952, Rymer conveyed a portion of his Jenkins Road property to Mabel Smith, a neighbor, for a cash price of $700. Out of this amount Rymer paid $426 to the Fidelity Trust Company, which was in full of one of its notes, including interest. He also paid taxes on the property approximating $14.35, and spent the balance. Thereupon, the Guardian filed the bill herein, naming as defendants the Fidelity Trust Company, the Milligan-Reynolds Title Agency, Inc., Trustee, and Mabel Smith.

Among other things the bill alleges specifically that Rymer was mentally incompetent when the two deeds in question were executed, that his adjudication of incompetency in the County Court of Hamilton County was notice to all the world, and it prayed that both instruments be invalidated and removed as clouds on Rymer's property.

Answering separately the defendants denied that Rymer was incompetent when he executed the deeds or that their business transactions with him were not in good faith. They specifically denied that the proceedings in the County Court in which Rymer was adjudged incompetent under the Uniform Veterans' Guardianship Act was notice to the world. They averred that said guardianship was only for a limited purpose, namely, for drawing and investing the funds paid to the veteran by the Government, and they denied that complainant was entitled to any relief.

Upon motion seasonably made, the Veterans Administration was permitted to intervene as a party in interest as provided by Section 2, Code Sec. 8541.1, of the Act,

and the Chief Attorney of the Agency filed briefs and appeared below, as well as before the bar of this Court, in support of the complainant's contention. The case has been ably argued and briefed.

Upon the hearing, which was on oral testimony, the Chancellor held (1) that Rymer's adjudication as an incompetent under the Uniform Veterans' Guardianship Act was constructive notice to the world, and (2) that the appointment of a Guardian under the Act empowered him to handle the Veteran's property as though appointed under the general guardianship laws of the State, and it was accordingly decreed that the deed and deed of trust be set aside.

The defendants have appealed to this Court, and errors have been assigned in which it is urged that the Chancellor erred in deciding the two above questions adversely to them.

After giving careful consideration to the contentions of the respective parties, we think that the late Chancellor Ziegler correctly decided the issues involved, and we approve and concur in the following portions of his logically reasoned opinion:

"From the testimony of the guardian, Walter O'Millinuk, Dr. J. B. Swafford, C. M. Hickerson, Field Examiner for the Veterans Administration, three merchants whose places of business are in the immediate vicinity of the ward's residence, Carl Baker, Clerk and Master, and former schoolmate of the ward, mother and brother of the ward, all of whose testimony was implemented by the recitations of various activities, incidents and behaviors in which no sane person would indulge, I think there can be no reasonable doubt that the ward was insane

and wholly incapable of competently conducting his own affairs at the time these challenged transactions occurred.

"From the testimony, I find that the lender to and the purchaser from the complainant did not know of his insanity at the time of the transactions since they had only casual contact with him, during which time he appeared to be sane, but, that had inquiry been made in the vicinity of complainant's residence and particularly of his mother, with whom he lived or his guardian who had been dealing with him, the lender and purchaser would have learned definitely of his insanity.

"The lender and purchaser were not particularly concerned with the sanity or insanity of the complainant with whom they were dealing, since both of them were relying on title gurantees for which applications had been made. There was no bad faith on the part of the lender or the purchaser and there is nothing in the evidence to indicate that the purchase price of the realty did not represent its fair value.

"Though there is no direct testimony in the record to this effect, from the general behavior of the ward, his incongruous vagabondages, wanderings, grandiose schemes and hallucinations, I think it might be reasonable to conclude that the money he received from the loan served him no useful purpose and that he received no benefit therefrom. The same is true as to that portion of the proceeds of the sale retained by him.

"On the basis of these findings of fact, the legal question presents itself as to the validity of the two transactions sought to be set aside.

■ "The major controversy between the parties is whether an adjudication under the Uniform Veterans' Guardianship Act carries with it legal notice to the world such as is true of adjudication under the regular guardianship statute. The testimony of the two attorneys for the title guaranty companies which guaranteed the loan and the purchase, in my opinion, throws substantial though indirect light on this question. They both testified that in their regular routine practice in title investigations, search is not made of County Court's records adjudications of insanity and appointment of guardians either under the regular guardianship act or the veterans' act, which means in this particular instance record of the adjudication would not have been found if it had been under the regular act. Moreover, these attorneys testified that if they had searched the records of the County Court and had found the adjudication of the complainant under the Uniform Veterans' Guardianship Act, they would have made further inquiry as to the actual insanity of the person purportedly adjudicated and as above indicated, if they had made the slightest inquiry of the mother or guardian of the complainant, there would have been no doubt of the definite knowledge of his insanity and, in all probability, neither the loan nor the purchase would have been made. Accordingly, for practical purposes, it would make no difference to the lender and the purchaser in this case whether the adjudication was under the regular guardianship act or the Uniform Veterans' Guardianship Act. Though I have no direct authority in text or decisions in support thereof, I think common sense

and the rationale underlying the holding in Pritchett v. [Thomas] Plater & Co., 144 Tenn. 406, 232 S.W. 961, sanctions the following statement: If an adjudication of insanity is made in a court of competent jurisdiction under either the regular guardianship act or the Uniform Veterans' Guardianship Act, but by reason of some fatally defective procedural step, such proceeding is wholly invalid, the mere fact of the purported record adjudication would be sufficient to place any person having knowledge thereof on notice that inquiry as to actual insanity should be made.

■■ ''Of course, a valid adjudication under the regular guardianship act establishes beyond cavil legal insanity of the person adjudged until such sanity is judicially restored and makes the acts of any such person adjudged void. Pritchett v. [Thomas] Plater & Co., supra. That adjudication under the Uniform Veterans' Guardianship Act has the same conclusive effect as adjudication under the regular guardianship act has not been held by our courts. So far as legal procedure in the regular trial courts is concerned, adjudication of insanity and restoration of sanity in the County Courts, usually presided over by laymen, is very informal. The statute authorizes this informal procedure and I do not mean to gainsay its practicality and desirability, since most adjudications thereunder are uncontested, but as a matter of common knowledge and of which knowledge judicial notice can be taken, it is a very simple matter to procure lunacy adjudications under the regular act upon testimony of doctors who have had the most casual opportunity to observe the al-

leged incompetents. I think it not unreasonable to assume that by and large, veterans who have been adjudged under the Uniform Veterans' Guardianship Act have been examined by doctors of the Veterans Administration who specialize in mental disorders and who have had better opportunity to observe them than is true of doctors in the examination of nonveterans. Therefore, it seems to me that an adjudication under the Uniform Veterans' Guardianship Act would be much more weightily persuasive as to the de facto insanity of a veteran than would be an adjudication of a nonveteran under the regular act. If the contention of the defendants as to the limited effect of an adjudication under the Veterans' Act were sustained by the courts, it would mean that a veteran actually insane and having been so adjudged under the Veterans' Act would have to be readjudicated under the regular act if full notice to the world were to be given and the guardian vested with power over all property. I do not believe the Legislature would intend to require this noncommonsible [noncommonsensible] procedure. For this reason, to sustain the contention of the defendants as to the restrictive effect of adjudication under the Uniform Veterans' Guardianship Act, would be giving too much regard to traditions and technicalities and too little value to common sense and practicalities.

"I think the insistence of the Veterans Administration that the Legislature intended to enact a law that would provide a practical, speedy and economical procedure for the appointment of guardians for incompetent veterans is soundly based.

"For the foregoing reasons, I am of the opinion that it was the Legislative intent when it enacted the Uniform Veterans' Guardianship Act and amendments thereto, to vest full power in the guardian to handle all incompetent veterans' property and thereby give notice to the world. Accordingly, the deed and deed of trust will be set aside as prayed."

In support of the defendants' insistence that the powers of a guardian appointed under the Uniform Veterans' Guardianship Act are limited, they rely upon reported decisions of the Courts of Georgia and Louisiana which have construed the Veterans' Guardianship Laws of those states. See Annotation 173 A.L.R. 1077-1079. In each of these states it appears that the provisions of the laws referred to limit the powers of a guardian appointed thereunder, and in this respect they are similar to the provisions found in the Uniform Veterans' Guardianship Law of this State, Chapter 62, Public Acts of 1929, Code Section 8541 et seq., before the present Law was enacted. Therefore, the decisions relied upon by the defendants are not persuasive.

It appears that the old Uniform Veterans' Guardianship Act, Chapter 62, Public Acts of 1929, defined the terms "estate" and "income" to "include only moneys received by the guardian from the Bureau (now the Veterans Administration) and all earnings, interest and profits derived therefrom", and the guardian was required to execute a bond "in an amount not less than the sum then due and estimated to become payable during the ensuing year." This Act made no reference to the guardian's duty with regard to the ward's personal property or accountability for the income derived

therefrom, as does the present Act, as will hereinafter appear.

Under the present Act, Section 1, also Code Section 8541, the Act not only eliminates the words ''shall include only moneys received'' from the definition of income, but the Act gives the terms ''estate'' and ''income'' a much broader meaning, as follows:

'' 'Income' means monies received from the veterans administration and revenue or profit from any property wholly or partially acquired therewith.

'' 'Estate' means income on hand and assets acquired partially or wholly with 'income.' ''

■ With respect to the guardian's bond, Section 9 of the Act, Code Section 8548, requires that the bond be ''in an amount not less than the estimated value of the personal estate and anticipated income of the ward during the ensuing year.'' As used here, does the Act limit ''personal estate and anticipated income'' to ''only moneys received by the guardian from the Bureau and all earnings, interest and profits derived therefrom'', as provided under the old law? We think not, and to so hold would be to read in the law a provision clearly not intended by the Legislature when the present Act was enacted.

Furthermore, Section 10 of the Act, Code Section 8549, not only provides how the guardian shall account for income derived from the Veterans Administration, but from other sources as well. This Section provides, as follows:

''Every guardian, who has received or shall receive on account of his ward any monies or other thing of value from the veterans administration shall file with the court annually, on the anniversary

date of the appointment, in addition to such other accounts as may be required by the court, a full, true, and accurate account under oath of all monies or other things of value so received by him, all earnings, interest or profits derived therefrom and all property acquired therewith and of all disbursements therefrom, and showing the balance thereof in his hands at the date of the account and how invested.

\*    \*    \*    \*    \*    \*

*"If the guardian is accountable for property derived from sources other than the veterans administration, he shall be accountable for such other property as is, or may be required under the applicable law of this state pertaining to the property of minors or persons of unsound mind who are not beneficiaries of the veterans administration, and as to such other property shall be entitled to the compensation provided by such law. The account for other property may be combined with the account filed in accordance with this section."* (Italics supplied.)

We therefore hold, as did the late Chancellor, that the order entered in the County Court of Hamilton County adjudging Rymer incompetent and appointing Mr. O'Millinuk guardian of his estate, was constructive notice to the world, and that a guardian appointed under the Uniform Veterans' Guardianship Act is empowered with the duties of a general guardian.

It results, for reasons indicated, that the decree below will be affirmed at the defendants' costs, and the cause will be remanded for such orders as may be necessary to enforce the decree.

McAmis, P. J., and Hale, J., concur.